# CASES

# SUPREME COURT OF ALABAMA.

### DECEMBER TERM, 1880.

---

## Forrest's Ex'rs *v.* Luddington.

68 | 1
113 | 579
68 | 1
120 | 218

*Bill in Equity by holder of State-Indorsed Railroad Bonds to enforce the Statutory Lien for his benefit.*

1. *Surety ; principal entitled to benefit of securities taken from debtor by.* A creditor is entitled to the benefit of all securities or pledges which the surety may receive from the principal debtor, either for the payment of the common debt or indemnity of the surety against loss by reason of his liability. Such securities are regarded as a trust created for the protection of the debt, and a court of equity will compel the execution of the trust.

2. *Same; same; principle applies in this case.*—This principle applies to the statutory lien declared by the statutes (Acts of February 19th, 1867, amended September 22d, 1868), which authorize the indorsement by the State of railroad bonds to the extent of $16,000 per mile. This lien, by the terms of the statute creating it, is a security for the payment of the indorsed bonds, and operates as a specific appropriation of the property and franchises of the railroad corporation to their payment, whenever default shall be made by the corporation in the payment of the principal or interest.

3. *Summary remedies given by the statutes of February 19th, 1867, and of September 22d, 1868, as regards railroad bonds; who may enforce when the State fails to exercise its rights ; resort to a court of equity by holder of bonds.*—The powers and summary remedies conferred on the State by the statute for the enforcement of this lien, can only be exercised by the State, but the State, having failed to exercise them, and disclaimed its liability for the indorsed bonds, they afford no obstacle to a resort to a court of equity by the holders of the bonds for the enforcement of the statutory lien for their benefit; and the fact that the State cannot be made a party to the suit, no relief being asked against it, does not effect the jurisdiction of the court, or the equity of the bill.

4. *Junior incumbrancers; who are; when they need not be made parties defendant in such case.*—Persons holding a mortgage on the property of a railroad, executed after the indorsement of the railroad company's bonds by the State, are junior incumbrancers, and although they may be proper, they are not indispensable parties to a bill by the holders of the State-indorsed bonds.

5. *Decree in vacation; rules of practice as to.*—Under the statutory provisions and rules of practice which were in force in October, 1877, notwith-

[Forrest's Ex'rs v. Luddington.]

standing the inconsistency which existed between those formerly in force (as pointed out in *Torbut v. Rogers*, 58 Ala. 523), the Chancellor might render a decree in vacation in a cause which was submitted in term time, after the expiration of ninety days from the date of the submission.

6.   *State-indorsed bonds; when bondholders may enforce statutory lien.* The lien created and declared by the statute may be enforced by the bondholders whenever default is made in the payment of the interest on such indorsed bonds, although the Governor is directed by the statute to file a bill for foreclosure on default of the payment of the bonds.

7.   *Pendency of former suit; when not a bar.*—The pendency of a former suit in a Circuit Court of the United States in Tennessee, relating to the same subject-matter, is not available, under the facts in this case, to the defendants here to defeat a suit in the proper Chancery Court to enforce the statutory lien.

APPEAL from Perry Chancery Court.

Heard before Hon. CHARLES TURNER.

The appellee, claiming to own four hundred of the first mortgage bonds of the Selma, Marion and Memphis Railroad Company, filed this bill in his own behalf, and in behalf of such other holders of the same class of bonds of said company, as might come in and contribute to the expenses of the suit.

The bonds held by complainant were indorsed by the Governor under the act of February 19, 1867.

It is alleged in the bill that the company had failed to pay the interest upon these bonds as the statute requires; that the interest and interest-coupons which had become due since the first day of September, 1872, remained unpaid, and that one hundred and fifty thousand dollars of such interest belonged to appellee and was unpaid; that the corporation was insolvent and its property of every kind wholly insufficient to pay the past due interest; that the State, although having a statutory lien in the nature of a mortgage upon all the real and personal property of said corporation to secure it in its indorsement of the corporation's bonds, and though knowing the insolvent condition of the corporation, and that it had failed to pay the interest on its bonds as aforesaid, nevertheless refused, as indorser, to pay such interest, or to take possession of the property of said corporation, as it was by statute authorized to do.

Complainant claimed that he was, under the circumstances, entitled to be subrogated to the mortgage or lien of the State on the property, rights and franchises of the corporation, and to have such property, rights and franchises sold by order of the Chancery Court, and have the proceeds applied to the payment of complainant's bonds and interest thereon.

The bill prays for an account of what might be due complainant on his bonds; for the appointment of a receiver

[Forrest's Ex'rs v. Luddington.]

during the litigation, and for a sale of all the property of the corporation for the satisfaction of complainants' debt. A decree *pro confesso* was taken on this bill against the defendant corporation. Subsequently, leave was granted by the court to N. B. Forrest, appellant's testator, to file a petition in the cause, which, at the same term of the court, he did file.

This petition alleged that Forrest was a creditor of the Selma, Marion and Memphis R. R. Co., which was incorporated in the States of Mississippi, Tennessee and Alabama, and had been consolidated according to law. That in 1871, after such consolidation, the company executed a mortgage deed of trust to secure certain first mortgaged bonds of the company as consolidated, and petitioner alleged that he was the owner and holder of a large number of such bonds. It appears from the record that two suits of a like nature with appellee's had already been filed in the Perry Chancery Court, in one of which a receiver had been appointed. It was agreed between the counsel for complainant and Forrest that he might be allowed to come in and be made party defendant to the suit, and that the answer of Forrest as filed in one of the former suits, might be used as his answer in this cause, and that the evidence taken in said former suits might also be considered as evidence in this suit.

Forrest filed his answer as agreed upon, alleging his ownership of the bonds of the company as consolidated, denying the priority of the State's lien over the lien created by the trust deed securing his bonds, and denying complainant's right to be subrogated to the statutory lien of the State. He also set up that the United States Circuit Court for the Western District of Tennessee, had assumed jurisdiction over the subject-matter of the litigation and appointed a receiver over the same. He also pleaded that the trustees under the deed of trust, made to secure such bonds as he held, were not made parties defendant, and that hence the suit should be abated.

These were substantially the facts in the case, as there does not appear to have been any discrepancy between the allegations of the bill and answer and the evidence adduced in their support.

The court decreed that complainant was entitled to the relief prayed for; that the State's lien was superior to that of any other creditor; that the complainant should be subrogated to the State's lien, and that the receivership of one T. T. May, who had been appointed in one of the above mentioned former suits, should be extended to this suit. It was further decreed that the property of the corporation should be sold to satisfy the bonds indorsed by the State.

An account was ordered to ascertain what was due complainant, and such other holders of the same class of bonds as might come in and prove their claims before the Register.

This decree was rendered in vacation without the consent in writing of the parties or their counsel. Subsequent to the rendition of this decree, the death of Forrest was suggested and leave given appellants to make themselves parties as his executors.

There were twenty-two grounds of error assigned in this court, the principal ones of which, and the only ones mentioned in the opinion, are as follows :

1st.   That the State was not made a party to the suit.

2d.   That the appellee was not entitled to be subrogated to the State's statutory lien.

3d.   That the suit should have been dismissed, it appearing that the United States Circuit Court for the Western District of Tennessee, had assumed control of and appointed a receiver over the property in litigation; and,

4th.   That the State's lien was not prior in point of law to the lien created by the deed of trust securing appellant's bonds.

W. R. NELSON, for appellants.

JNO. F. VARY, for appellee.

BRICKELL, C. J.—The appellee, suing for himself and all other holders of like bonds of the Selma, Marion and Memphis Railroad Company, on the 6th day of September, 1877, filed his original bill in the Court of Chancery, claiming a lien on the railroad, its equipments, and all other of its property, including its franchises, in the nature of a mortgage, as a security for the payment of the principal and interest of the bonds held by him, and other bonds of the same class.   These bonds bear date September 1st, 1869, are for the sum of one thousand dollars each, payable at twenty years, with coupons attached for the payment of interest semi-annually at the rate of eight per cent. per annum, and are endorsed by the Governor in the name of the State.   On the face of each bond, it is stated to be a "first mortgage eight per cent. bond, indorsed by the State of Alabama." In the body it is recited :   "This is one of a series of bonds of the same tenor, date and amount, numbered from one upwards, and limited to $16,000 per mile of completed railroad in the State of Alabama, issued under the provisions of an act of the General Assembly of Alabama, entitled 'An act to

establish a system of internal improvements in the State of Alabama,' approved February 19th, 1867," and an act amendatory thereof, approved September 22d, 1868; all secured by a first and exclusive lien, provided for in said acts, on the railroad of said company, and its equipments, and all other property, including the franchises of the company, with powers of sale in case of default, and by indorsement of the State of Alabama, made under authority and in pursuance of the acts of the General Assembly aforesaid."

The act of the General Assembly approved February 19th, 1867, referred to in the bond, required the Governor, when a railroad company, incorporated by the laws of this State, had finished, completed and equipped twenty continuous miles of its road, in the name of the State to indorse *the first mortgage bonds of the company*, to the extent of twelve thousand dollars per mile, for the next section of twenty miles of road; and so on, until the road was completed within the limits of the State  The bonds were to be payable in a period of not less than fifteen, nor more than twenty years, bearing interest not exceeding eight per cent., payable semiannually; and on their face were to recite the fact, that they were *first mortgage bonds*, issued in accordance with, and upon the conditions in the act prescribed. And the act declared, "*Said first mortgage, and bonds issued thereon, shall have priority in favor of the State, of any and all other liens whatever.*" The seventh section of the act reads: "That so soon as the Governor, on the part of the State, shall indorse the bonds of any company, for the first section of any road as aforesaid, and for each successive section, said indorsement shall constitute a lien upon said section or sections so prepared as aforesaid, including the road-bed, right of way, grading, bridging and masonry, upon all the stock subscribed for in said company, and upon the iron rails, chairs, spikes, and equipments, when purchased and delivered; and the State of Alabama, upon the indorsement of said bonds, and by virtue of the same, shall be invested with said lien or mortgage, without a deed from the company, for the payment by said company of said bonds, with the interest thereon, as the same becomes due; and when the whole of said road shall be completed, the State of Alabama shall be invested with a lien, without a deed from the company, upon the entire road, including the stock, right of way, grading, bridges, masonry, iron rails, spikes, chairs, and the whole superstructure and equipments, and all the property owned by the company as incident to or necessary for its business, and depots, and depot stations, for the payment of all of said bonds indorsed for the company as provided in this act, and

[Forrest's Ex'rs v. Luddington.]

for the interest accruing on said bonds; and after the Governor, on the part of the State, shall have indorsed the bonds aforesaid, for the first section of the road, it shall not be lawful for said company to give, create, or convey, to any person or persons, or body corporate whatever, any lien, incumbrance, or mortgage of any kind, which shall have priority over, or come in conflict with, the lien of the State secured; and any such lien, incumbrance, or mortgage, shall be null and void as against such lien or mortgage of the State; and the said lien or mortgage of the State shall have priority over all other claims existing, or to exist, against said company."

It was provided by the act, that fifteen days before the interest on the bonds indorsed became due and payable, a sum sufficient to meet it should be deposited with the Comptroller of the State, or he should be furnished with satisfactory evidence that it had been provided for, or paid. If there was default, the Comptroller was required to report it to the Governor, whose duty it was to appoint a receiver to take charge of the road, and apply its rents, issues, profits and dividends, to the liquidation of the unpaid interest; and when that was satisfied from the net profits, it was the duty of the receiver to surrender possession to the company.

The ninth section of the act is as follows: "That if said company shall fail, or refuse, to pay any of said bonds when they fall due, it shall be the duty of the Governor to notify the Attorney-General of the fact, and, through said Attorney-General, shall forthwith file a bill against said company, in the name of the State of Alabama, in the Chancery Court of the district in which is situated the place of business of said company, setting forth the facts; and thereupon said court shall make all such orders and decrees in such cause as may be deemed necessary by the court, to secure the payment of said bonds, with the interest thereon, and to indemnify the State of Alabama against any loss on account of the indorsement of said bonds, by ordering the said railroad to be placed in the hands of a receiver, ordering the sale of said road, and all the property and assets attached thereto, or belonging to said company, or in such other manner as the court may deem best for the interest of the State."

. These are the provisions of that act now material. The amendatory act of September 22d, 1868, referred to, has no provision now material, except that an indorsement for sections of five miles is authorized, after the completion of the first twenty miles, and the amount is increased from twelve to sixteen thousand dollars per mile. It is also declared, the bonds *shall constitute a lien on the whole road, whether lying*

[Forrest's Ex'rs v. Luddington.]

*in or out of the State.* As in the former act, the indorsement is to be of *the first mortgage bonds of the company.*

It is averred in the bill that, since the first of September, 1872, the company has been in default in payment of interest, and of interest on all the bonds issued by the company, and indorsed by the State, there was an accumulation of more than three hundred thousand dollars; that the company is insolvent, and is misapplying its income, and its property deteriorating in value, and that the State refuses payment of the interest accumulated, or to take charge of the road and other property of the company. The prayer of the bill is, that the statutory lien be enforced for the benefit of the complainant and other bondholders; that a sale be made of the road, its equipments, &c., and the proceeds applied in payment of the interest on the bonds, and for general relief.

1. The principle, upon which the equity of the bill depends, is, that a creditor is entitled to the benefit of all securities or pledges which the surety may receive from the principal debtor, either for the payment of the common debt, or for the indemnity of the surety against loss because of his liability; that all such collateral securities are trusts created for the better protection of the debt—of them the surety is a trustee, and a court of equity is bound to see that they fulfill their design. The principle is not controverted by the appellants; but they insist it must be accepted with this limitation, that when the security is merely personal to the surety—when, by the terms of its creation, it is confined solely to his indemnity, in opposition to, and excluding the idea of a security for, or the provision of sources and means from which the common debt is to be paid—a trust, enuring absolutely to the benefit of the creditor, is not created; and the only right he can assert is that of subrogation to the place and rights of the surety; and if the latter has not been damnified, or if he is discharged from liability, by subrogation, the creditor cannot acquire rights. And if it is insisted that the lien or security created by the statutory provisions to which we have referred, for the protection and indemnity of the State against its liability as indorser of the bonds of the railroad company, is a mere particular, personal security to the State, not available to the bondholder. There are several reasons assigned which are supposed to render it unavailable. The first is, that subrogation is an equity which can be worked out only through the liability of the State; and as the State is not a party, and is, by constitutional provision, protected from suit, there can be no adjudication of its liability. Another reason is, that the State has not been

damnified—has not lost anything by reason of the indorsements, and disclaims all liability for them.

The necessities of this case do not require us to consider when a particular security will be regarded as intended for the protection of the debt, enuring to the benefit of the creditor, creating a trust attached to the debt, capable of enforcement in equity, whether the surety has been damnified or not, and surviving and continuing, though his liability may be discharged, or lost by the laches of the creditor; and when it will be regarded as a mere personal security to the surety, intended alone for his indemnity, rights which the creditor must derive from subrogation. For it seems clear to us, that, by the terms of the creation, the statutory lien is a security for the payment of the bonds; and that to the State, as indorser, protection and indemnity is afforded by a specific appropriation of the property and rights of property of the railroad company, the principal debtor, on which the lien operates, to the payment of the bonds, whenever the latter should be in default.—*Kelly v. Trustees*, 58 Ala 489 ; *Colt v. Barnes*, at last term.

The railroad company had full capacity to mortgage, or pledge, create trusts, or declare liens on its property, either for the payment of the bonds, or for the mere particular indemnity of the State as its indorser. The State, no constitutional limitation intervening, could enter into contracts with the company, and declare the terms and conditions upon which it would become the surety, or indorser, or guarantor of the bonds of the company. For itself it could determine whether security for the payment of the debts on which it became liable in either capacity should be given ; or whether the security should be available only when in addition to being dishonored by the default of the company, it must have sustained loss by reason of its answering for that default, excluding all idea of security for the debt. The agreement between the State and the railroad company, must be regarded as expressed in the statute, for that is the only authority for the indorsement of the bonds in the name of the State, and to its terms, conditions, and trusts, the railroad company yielded assent when it procured the indorsements. The character of the lien, its operation and effect, and the intention of the State, and the railroad company in its creation, must be collected therefore from the statute, and enforced so that its purposes will be accomplished. Nor can the construction be varied because the State is a party—nor because the terms of the contract are expressed in a statute, rather than in an instrument of less solemnity to which natural persons alone may be the parties.

[Forrest's Ex'rs v. Luddington.]

The material provisions of the statute in this respect, are, that on the face of the bond must be recited the fact that it is a *first mortgage bond,* issued in accordance with and upon the conditions of the act; *and said first mortgage and bonds issued thereon, shall have priority in favor of the State, over any and all other liens whatever.* Then, in the seventh section it is declared—that each indorsement shall constitute a lien; "and the State of Alabama, upon the indorsement of said bonds, and by virtue of the same, shall be invested with said lien or mortgage, without a deed from the company, for the payment by said company of said bonds, with the interest thereon, as the same becomes due, and when the whole of said road shall be completed, the State of Alabama shall be invested with a lien, without a deed from the company, upon the entire road," &c. And further, "the said lien or the mortgage of the State shall have priority over all other claims existing, or to exist against said company." These are the terms employed in the creation of the lien, and by these, its nature, extent and operation must be measured. True, the lien or mortgage is spoken of uniformly as the lien or the mortgage of the State, and such it is undoubtedly. The State and the company were the only contracting parties; contracting before the bonds had been issued or negotiated, and before there was or could be a common creditor of the company and of the State. Contracting in view of a liability to a common creditor, for though the company executed the bond, and the State indorsed, there was no liability upon either, until the company negotiated the bond; then the liability of the company as the principal debtor and the liability of the State, as indorser, spring into existence, and it was in view of the common liability to a common creditor which would come into existence when there was negotiation of the bond, that security to the State was designed. As a beneficiary, the holder of the bond is not mentioned in the statute, and the State only is mentioned in that relation. There is nevertheless a clear, unequivocal expression of the purpose for which the *lien* or *mortgage,* as it is indifferently styled, is intended in more than one place in the statute. In one place, it is said to be *for the payment by said company of said bonds with the interest thereon, as the same becomes due.* In another, it is said to be *for the payment of all of said bonds indorsed for the company as provided in this act, and for the interest accruing on said bonds.* As we said in *Colt v. Barnes, supra,* if a mortgage, deed of trust, or other security expressed in these terms had been given by a natural person to his surety, that a trust would be created, for the better protection of the debt, enuring to the benefit of the creditor, which

a court ef equity, at his instance, would lay hold of and enforce, is settled by former decisions of this court. The payment of the debt would be regarded as the primary, controlling purpose, by means of which indemnity and ease to the surety is to be afforded; and to this purpose there would be made a specific appropriation of the property upon which the lien operated.

In *Toulmin v. Hamilton*, 7 Ala. 362, this question was first presented to this court. The drawer of several bills of exchange had given to his accommodation acceptor two promissory notes embracing the amount of the bills and a separate indebtedness due the acceptor. These notes having much longer time to run than the bills, were secured by a deed of trust on lands and slaves. The parties becoming insolvent, the holders of the notes, who seem also to have been holders of the bills, claimed to subject the property covered by the deed of trust to their payment. The court said, after reciting the facts : "The deed of trust, then, is a security, given by the principal debtor, to one who stands to him as a surety, and the question is, whether the holder of the notes has a right in equity to enforce the security for his benefit. Of this, we think there is no doubt." And throughout the opinion it will be observed the deed of trust was regarded as a trust for the payment of the debts, and the jurisdiction of the court rested upon its power and duty to enforce trusts. The case was soon followed by that of *Ohio Life Insurance Co. v. Ledyard*, 8 Ala. 866, in which the maker of promissory notes had executed a deed of trust to indemnify the indorsers, and without making payment, he, and the indorser, had become discharged bankrupts. The holders of the notes claimed in equity the enforcement of the deed of trust, as a security for their benefit. "ORMOND, J., said in the case of *Toulmin v. Hamilton*, 7 Ala. 367, which, upon this point, is in principle, identical with this, we had occasion to consider this question. It was there, upon great consideration, held, that when a deed of trust was given to indemnify an accommodation acceptor, the holders of the paper might resort to the trust property for the payment of the paper when dishonored." That is the precise predicament of this case. The deed of trust was executed to secure or indemnify Robertson, Beale & Co., as indorsers of certain notes, which it appears by the testimony of Greene, had been previously given to T. & C. Matthews. The rule as established by that case, is, that the creditor is entitled to the benefit of all pledges, or securities given to, or in the hands of the surety, for his indemnity, to be applied to the payment of the debt. It does not in the slightest degree vary the case, that the

indorsers have become bankrupt, and have no estate for distribution. The right of the holder to the benefit of this security, does not depend upon the liability of the surety to be damnified ; *it is because it was a trust created for the better security and protection of the debt.* It, therefore, attaches to the debt, and those interested in it, may affirm the trust, and enforce its performance.—*Moses v. Murgatroyd,* 1 Johns. Ch. 129. It is also to be observed, that the right to sell vested in the trustee, did not depend upon the fact that the indorsers of the notes were compelled to pay upon their indorsement, but the trust was to sell if the notes were not paid by Greene, the maker, in seventeen months, and to pay and discharge the notes."

In *Cullum v. Br. Bank Mobile,* 23 Ala. 797, the principal assigned a mortgage to a trustee, upon condition that he should hold the same *as security for George Cullum on account of his endorsement of a promissory note for the principal ;* and with authority, if the note due by the principal was not paid, to collect the notes secured by the mortgage, and pay the same out of the proceeds. The statute of limitations had perfected a bar of remedies at law on the note. The court says : "As to the trust itself, although it was made for the protection of George Cullum, yet that was not the only object. It was also made for the better protection of the debt, as is evidenced most clearly by the authority given in the assignment to collect the mortgage notes, and out of the proceeds to pay the note of Charles Cullum, on his failure to pay the same ; and it certainly requires no authority to show that in such a case, the creditor is entitled to the benefit of the security. This court has sustained the principle, in cases not so strong as the one under consideration.—*Toulmin v. Hamilton,* 7 Ala. 767 ; *Ohio Life Ins. Co. v. Ledyard,* 8 Ala. 866. Nor does it make the slightest difference, that the note is barred by the statute of limitations. So far as George Cullum is concerned, the creditor's right to the security does not depend upon the liability of the surety to be damnified, but upon the fact that the assignment was made to protect the debt."

In the more recent case of *McMullen v. Neal,* 60 Ala. 555, a deed of trust was given by the drawer of a bill of exchange for the security of his indorsers, with condition as follows : "Should I make default in paying said bill at maturity, then the trustee may proceed, after giving thirty days notice, to sell to the highest bidder, for cash, the land before described, and with the proceeds pay said bill of exchange, with all costs, damages," &c. Mr. Justice STONE, speaking for the court, said : "This deed is a direct security to the holder of

[Forrest's Ex'rs v. Luddington.]

the bill of exchange; and when the bill matured, and was dishonored, he was not bound to wait until the indorsers were damnified, by forced collection of the money by suit or otherwise. He had the right then to demand that the trustee should execute the trust for his benefit; and if the trustee had refused, or failed to do so, he could, in equity, at once have coerced a sale of the property, for the payment of his claim. This right springs out of the very language of the trust deed; and if Neal had no agency in procuring the execution of the deed, and even knew nothing of its existence, this does not, in the least, impair or qualify his rights. The security existed, whether he knew it or not; and being for his benefit, the law presumes his acceptance of its provisions."—See, also, *Br. Bank Mobile v. Robertson*, 19 Ala. 798; *Troy v. Shields*, 33 Ala. 469; *Saffold v. Wade*, 51 Ala. 214.

These authorities have settled the principle that any security taken by a surety for his protection or indemnity, if not by the very terms upon which it is taken otherwise limited, becomes a trust for the better security of the debt, attaches to and attends the debt into whatever hands it may pass. Although its existence may not be known to the creditor when he purchases or acquires the debt, his assent to it is presumed because it is beneficial to him, and when informed of it, a court of equity will aid him in appropriating it to its proper destination, the payment of the debt, giving ease to the surety, and extinguishing the liability of the principal. The surety as to such securities stands to the creditor and the principal in the relation of a trustee, and a court of equity will compel him to the execution of the trust. Nor is it important whether the surety has been damnified or not, nor whether his liability continues, or is lost by the want of diligence on the part of the creditor in taking the necessary steps to preserve it, or in consequence of a discharge in bankruptcy. So long as the debt is unextinguished, the trust remains and will be enforced. Of the *lien* or *mortgage*, or by whatever name the security may be termed which the statute creates and declares valid and operative, without writing in the form of a deed or otherwise, there is but one event in which its extinguishment is contemplated, and that is the payment of the bonds, principal and interest. Its continuance, so long as they are unpaid, in whole or in part, is intended. And another feature of it is, that it is only after the company has made default in payment, or providing means of payment, that its possession of its property can be disturbed. These features were found in all the securities this court had heretofore declared created trusts for the pay-

[Forrest's Ex'rs v. Luddington.]

ment of the common debt, not mere personal indemnity to the surety ; and in several of the cases there was a less clear, unequivocal expression of the purpose of the security than is found in the statute. In all cases, indemnity, protection to the surety, is intended, and it is afforded by applying the security to the payment of the debt. To afford him indemnity he may be clothed with large power over the security, so that he may appropriate it quickly to his relief. Conferring such powers upon him, powers the creditor who can reach the security only through the aid of a court of equity could not claim or exercise, does not necessarily import that security shall enure to him only, excluding a trust enuring to the benefit of the creditor. The statute confers on the State very large powers over the property on which the lien operates, if the company made default in payment of principal or interest. Speaking of these in *Kelly v. Trustees*, 58 Ala. 499, we said : "The remedies the statute affords are given to the State, and the State alone can preserve them. They can not be resorted to by the bondholder, or by the trustee, or assignees for his security, and can not exclude the right he, or they, may have at common law, or in equity, not derived from the statute," &c. It was also said : "If the statute had extended to the bondholders, or to trustees, or to assignees, for their security, the remedies it provides, without a negative, express or implied, of the right to the equitable remedy, the statutory remedies would have been regarded as cumulative, and it would have been matter of election with them to pursue the one or the other." It is as insisted by appellant's counsel, a general rule, which this court has frequently acted upon (and sometimes been constrained to act upon it, even to the disappointment of all remedy), that when a statute creates a new right, and provides a specific remedy for its enforcement, the statutory remedy is exclusive. But the right of the bondholder to enforce the statutory lien is not given by the statute —it is derived from the general principles and doctrines of equity jurisdiction, upon which statutory innovations are not presumed.—1 Kent, 464. For the same reason, we can not doubt that in the event which has occurred the default of the company in paying the interest on the bonds, the State could have resorted to a court of equity for the enforcement of the lien the statute creates, if that had been preferred to the statutory remedies. There is nothing in the statute or in its purposes, negativing the jurisdiction of the court, or tying the State down to particular remedies.

2. There would be, perhaps, insurmountable difficulties in this cause, because of the absence of the State, as a party,

and the impossibility of making it a party defendant, if the rights conferred upon it by the statute had been exercised. If, through its officers and agents, possession of the property had been taken for its protection and indemnity, courts would be very reluctant to interfere, if there could be interference under any circumstances.—*Branch v. M. & E. R. R. Co.* 2 Woods, 388. But these rights the State has disclaimed, as it was in its volition to disclaim or to assert them. Not only has there been a disclaimer of all such rights, but if not an express, an implied disavowal of all liability for the payment of the bonds, principal, or interest. While the State is by the statute made a beneficiary of the lien it creates, it stands also in the contemplation of a court of equity in the relation of a trustee. It is in that relation it is clear the statute intends it shall stand, if it asserts and exercises the remedies the statute confers. Having possession of the property, the statute devotes absolutely the *rents, issues, profits and dividends, toward the liquidation of the unpaid interest on the bonds.* A trust fund is thus created by the statute, and from the purposes to which it is appropriated, there could be no diversion, without a breach of duty, it can not be supposed the State would permit or commit. Not asserting any rights, and disclaiming all liability, does not revoke, or extinguish, or destroy the trust fastened by the statute for the payment of the bonds. The failure or refusal of the State to execute, or aid in the execution of the trust, is only an additional reason for the interference of a court of equity, which will not suffer trusts to fail because of the want of a trustee to execute them, or because the trustee refuses to recognize them. When a State has rights and interests commingled with the rights and interests of individuals, and can not be made a party to litigation springing out of them, the jurisdiction of courts is not suspended. If, as in the present case, no decree or judgment is sought against the State, the freedom from suit attaching to her sovereignty, is a sufficient reason for dispensing with her presence, as a party.—*Daire v. Gray*, 16 Wall, 220 ; *Young v. M. & E. R. R. Co.* 2 Woods, 612 ; *Kelly v. Trustees, supra.*

3. The trustees, Hill, Fort and Coleman, can not be regarded in any other light than as junior incumbrancers. The mortgage to them was executed after the indorsement of the bonds of the State, and on its face expresses its subordination to the lien created by the statute. They would have been proper, but they are not necessary or indispensable parties.— *Callum v. Batre*, 2 Ala. 415.

4. The rendition of decree in vacation, was authorized at the time of the submission of the cause in October, 1877, and

[Forrest's Ex'rs v. Luddington.]

at the time of its rendition in November, 1877, by the 80th rule of Chancery Practice. That rule was originally adopted by this court, at the January term, 1856. Whether it was not in conflict with section 3470, of the Code of 1852, then the only statute referring to the rendition in vacation of decrees in chancery causes, is not now a practical question. That section of the Code, and the rule, were each incorporated in the Revised Code of 1867. The statute was repealed and the rule abrogated by the act of December 8th, 1873, (Pamph. Acts, 1873), which limited the power of the Chancellor to render decrees in vacation, to cases in which there was consent in writing by counsel ; and then it was contemplated they would be rendered within ninety days after the hearing. With that statute, the rule could not co-exist, and of consequence it was abrogated. This statute was, however, repealed by the act of February 4, 1876 ; but, as was explained in *Rogers v. Torbut*, 58 Ala. 523, under the limitations of the constitution, the result or effect of the repeal was not to restore the former statute it had repealed ; nor could it revive the rule it had abrogated.—*Dane v. McArthur*, 57 Ala. 448. The section of the act of February 4, 1876, which proposed to declare a rule in reference to the rendition of decrees in vacation, was not embraced in the title of the act, and of consequence offended the constitution, and so it was declared in *Torbut v. Rogers, supra*. In this condition of our legislation, this court in December, 1876, in the exercise of the power with which it is clothed, of ordaining rules of practice in chancery, re-adopted the rule, and promulgated it, to take effect on the 1st January, 1877. In the Code of 1876, the section of the act of January 4, 1876, which had been pronounced offensive to the constitution, is incorporated and forms § 3896. That Code was not of force until the 9th December, 1877, and if it operates an abrogation of the 80th rule of Practice in Chancery, could not affect the validity of this decree previously rendered.

5. The decree, as we understand it, enforces and forecloses the lien only for the unpaid interest, not for the principal of the bonds, which was not payable for about thirteen years in the future. We agree with the counsel for the appellants, that decrees of foreclosure depend upon and must find their warrant in the terms of the mortgage, or other security creating liens. There may be defaults in the payment of debts they are intended to secure which would not authorize a decree of foreclosure, because they are not the defaults for which the mortgage provides. A debt may be payable in instalments, and by the terms of a mortgage or other security for its payment, foreclosure may be postponed until there is

[Forrest's Ex'rs v. Luddington.]

default in the payment of the last installment. But we do not concur in the contention that such is the character of the statutory lien now sought to be enforced, or that it was intended its enforcement by decree of a court of equity should be postponed until the principal of the bonds should become due, though there was continuous default in the payment of interest. It is in that event only the statute directs the Governor to resort to a bill of foreclosure. In this respect, the statute is addressed to, and merely prescribes duties to be performed by officers of the State, not fixing and declaring the terms, conditions, and trusts of the security. These were prescribed by previous sections, and protection, indemnity, and security in the event of default in the payment of interest, whenever, and as often as it occurred, is as distinctly expressed as a condition upon which the security was capable of enforcement, as default in the payment of the principal.

6. It is not matter of doubt, that the court which first takes cognizance of a cause lying within its jurisdiction, is entitled to retain exclusive jurisdiction, until it is finally determined. How far the principle can be applied in the present case, and whether it is shown that the Circuit Court of the United States for the Western District of Tennessee had precedence of jurisdiction of the Chancery Court, of the subject matter of this controversy, are enquiries which we do not think the appellants are entitled to make. The pendency of suit against them in the courts of another State is not matter in abatement of a subsequent suit in this State. *Humphries v. Dawson,* 38 Ala. 204. Whether the court in which that suit is pending acquired jurisdiction, custody and control of the property, the court of chancery seized and committed to the custody of a receiver of its own appointment, may be matter of inquiry by the receiver of the United States Court, or by any person having an interest in, and authority to control the suit pending in that court. It can not be to a party who stands to each suit in no other relation than that of a defendant. Neither the receiver of the United States Court, nor any party having control of the suit pending in that court, has intervened in this suit, and claimed to be relieved from the conflict of jurisdiction if it exists. No claim to the property in the custody of the court of chancery has been asserted. There has been unbroken acquiescence in the exercise of jurisdiction by the court of chancery, and in the seizure, custody and sale of the property. There is no room for complaint by any other party, than one who is clothed with the right and authority of the United States Court, to assert the priority and exclusiveness of its jurisdic-

tion. If all who have that right and authority acquiesce, those who are without it must submit. Suppose the court of chancery, at the instance of appellants, had inquired into, and ascertained the priority of jurisdiction of the United States Court, what disposition could have been made of the property in its custody? Must it have been remitted again to the possession of the corporation, confessing its insolvency, and really an incapacity to preserve it? There could have been no transfer of it to the custody of the United States Court, for, under its authority, it was not claimed, and there was no agent or officer of its appointment to receive it. The result would have been that a beneficial exercise of the jurisdiction of either court for the protection of creditors of the corporation, would have been seriously impaired. The Chancery Court, at the instance of appellants, properly declined entering on this inquiry, and yielding to the asserted priority of the jurisdiction of the United States Court.

Without further extending this opinion, we do not find in this record, errors of injury to the appellants, and the decree must be affirmed.